UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION
05 JAN 25 PM 4:00
SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| Pinnacle Entertainment, Inc., a Delaware corporation, | |
| Plaintiff, | Cause No. _____ |
| vs. | |
| R.D. Hubbard, an individual; and the Indiana Gaming Commission, | |
| Defendants. | 1:05-cv-0122-SEB-VSS |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Pinnacle Entertainment, Inc. ("Pinnacle"), for its Complaint in the above-captioned action, alleges as follows:

### PARTIES

1. Pinnacle is a corporation domiciled in Delaware with its principal place of business in Las Vegas, Nevada. Pinnacle is the parent company of Belterra Resort Indiana, LLC, a Nevada limited liability company ("Belterra"), which is licensed by the Indiana Gaming Commission ("IGC") to own and operate a riverboat gaming facility located in Switzerland County, Indiana. Pinnacle has been approved by the IGC as a Substantial Owner of Belterra pursuant to the gaming laws of the State of Indiana.

2. Defendant R.D. Hubbard is an individual residing in Ruidoso, New Mexico. Mr. Hubbard was Chairman of the Board of Directors of Pinnacle until his resignation on April 10, 2002. He also resigned as a Director of Pinnacle as of April 26, 2002.

3. Defendant Indiana Gaming Commission is a duly constituted agency of the State of Indiana with jurisdiction over gaming activities in the State of Indiana.

## JURISDICTION AND VENUE

4.   This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332. This Court has personal jurisdiction over Mr. Hubbard because this action arises as a result of transactions and regulatory proceedings among Pinnacle, Belterra, Mr. Hubbard, and the IGC in the State of Indiana with respect to the facility in Switzerland County. Venue is proper in this district under 28 U.S.C. § 1391(a)(2).

## STATEMENT OF FACTS

5.   Pinnacle brings this action to clarify one urgent question: may Pinnacle sell 185,000 shares of its common stock to Mr. Hubbard pursuant to his attempted exercise of certain options through a notification delivered to Pinnacle on January 3, 2005? On one hand, if the IGC has not approved the exercise of Mr. Hubbard's options, Pinnacle, as a Substantial Owner approved by the IGC, could expose itself to an inquiry or disciplinary action by selling Mr. Hubbard the requested shares. On the other hand, if Mr. Hubbard is entitled to exercise his options, Pinnacle faces potential liability to Mr. Hubbard if it does not sell him the shares. Pinnacle's stock is publicly traded and therefore the potential profit or loss to Mr. Hubbard through the exercise of his options and presumed subsequent sale of shares is constantly subject to change. Pinnacle seeks a declaratory judgment to resolve this dilemma.

6.   At the time of his resignation as a Director of Pinnacle on April 26, 2002, Mr. Hubbard held, directly and indirectly, options to purchase 322,000 shares of common stock in Pinnacle (the "Options"). The average exercise price of such options is approximately $10.60 per share. Under the terms of the applicable Stock Option Plans, the Options ordinarily would have expired on May 26, 2002, one month after Mr. Hubbard's resignation as a Director of Pinnacle. The closing price of Pinnacle's stock on May 26, 2002 was $10.72 per share.

7. On or about May 13, 2002, at a meeting in East Chicago, Indiana, the Board of Directors of Pinnacle agreed to extend the Options beyond their otherwise scheduled expiration date subject to the approval of the IGC. In return for the conditional extension of the Options, Mr. Hubbard agreed not to assert an indemnity claim against Pinnacle for a fine it was anticipated the IGC would demand of Mr. Hubbard.

8. On May 24, 2002, pursuant to negotiations between the parties' counsel in Indianapolis, Mr. Hubbard agreed in writing that the Options "may not be exercised unless and until the IGC or its staff have expressly approved such extensions and exercise or, after having received written notice of such extensions, have not disapproved them within thirty (30) days after such notice, nor advised Pinnacle that it would be subject to administrative or other sanctions, fines or penalties if the options were exercised." Mr. Hubbard further agreed "not to exercise or seek to exercise any of such options unless and until the IGC or its staff have approved such extensions and exercise or have not disapproved them nor advised Pinnacle of possible sanctions as described above." It was important to both Pinnacle and Mr. Hubbard to obtain the IGC's approval of any transaction that resulted in any continuing relationship between them.

9. On July 29, 2002, the IGC met in Indianapolis for the purpose, <u>inter alia</u>, of approving an agreement between Mr. Hubbard and the IGC terminating, with respect to Mr. Hubbard, an investigation involving Pinnacle, Belterra, Mr. Hubbard, and others. Mr. Hubbard was represented at the meeting by his own counsel but was not personally present. In the course of the meeting, the then executive director of the IGC, John Thar, and Mr. Hubbard's counsel had a discussion wherein Mr. Hubbard's counsel asserted that Mr. Hubbard would not exercise the Options. There was no discussion as to whether or not the extension itself had been approved

or disapproved. Following further discussion, the commissioners approved the proposed agreement terminating the IGC's investigation with respect to Mr. Hubbard.

10. At the same meeting, the IGC approved a written agreement terminating its investigation with respect to Pinnacle and Belterra. Pinnacle and Belterra were represented by certain of their officers and by counsel. The agreement between Pinnacle and the IGC permitted Pinnacle to indemnify Mr. Hubbard for "reasonable and customary" legal expenses and travel expenses. The agreement between Pinnacle and Belterra and the IGC also provided that: "Any officer or director that has resigned as a part of the events that occurred on June 26-29, 2001, shall be permitted to retain and exercise any stock options held by them as of the date of this Agreement in accordance with their current terms, provided that they dispose of the underlying stock within ten (10) days of the exercise of the options. Belterra shall provide an Executive Summary of the stock options available to any officer or director affected by this provision." Mr. Hubbard was one of the persons that fell into that group.

11. Pursuant to the agreement between Pinnacle and Belterra and the IGC, on or about August 13, 2002, counsel for Pinnacle provided the IGC with an Executive Summary of the outstanding options held by resigning officers, which included Mr. Hubbard's Options. The expiration dates for the two blocks of Options specifically at issue herein were given in the Executive Summary, respectively, as April 26, 2006 and March 29, 2009. Such dates reflected the extension provided by Pinnacle's Board which was subject to IGC approval. The IGC received the Executive Summary and to Pinnacle's knowledge, did not disapprove or comment on the outstanding options or terms within the afore-mentioned thirty (30) day period.

12. On January 3, 2005, Mr. Hubbard sought to exercise certain of the Options as follows: 100,000 options at an exercise price of $9.625 per share for a total exercise cost of $962,500; and 85,000 options at an exercise price of $10.00 per share for a total exercise cost of

4

$850,000. This represents approximately fifty seven percent (57%) of the Options that were extended by the Pinnacle Board contingent on IGC approval. The closing price of Pinnacle's common stock on that date was $19.64 per share. Were Hubbard able to exercise and sell at that price, the pretax profit on such transactions would be $1,820,900. As of January 24, 2005, Pinnacle's common stock closing price was $16.83 for a potential profit of $1,301,050.

13. It is possible that Pinnacle's agreement with the IGC permits Pinnacle to honor the exercise of the Options in accordance with their "current terms" as of July 29, 2002. It is possible, further, that the IGC or its staff did not disapprove the extension and exercise of the Options following notice from Pinnacle's counsel, on August 13, 2002, of the extended expiration dates of the Options. If Mr. Hubbard is entitled to purchase the shares requested, failure to sell him the requested shares potentially exposes Pinnacle to liability.

14. Based on the proceedings at the IGC's meeting on July 29, 2002, it is also possible that the IGC disapproved the extension of the Options, and/or that Mr. Hubbard waived and relinquished his right to exercise the Options at the meeting. It is thus possible that Mr. Hubbard is not entitled to purchase any shares of Pinnacle stock pursuant to the Options. It is also possible that Mr. Hubbard's agreement not to exercise any of the Options was a condition of the IGC's acceptance of its July 29, 2002 agreement with Mr. Hubbard, and was a condition of the IGC's acceptance of its July 29, 2002 agreement with Pinnacle as well. If that is the case, and Pinnacle sells Mr. Hubbard any the shares requested based on his attempted exercise of the Options, or if Pinnacle provides any consideration to Mr. Hubbard related to the attempted exercise of the Options or to indemnification for his fine, Pinnacle potentially exposes itself, as a Substantial Owner of a gaming licensee, to an inquiry by the IGC or to disciplinary action.

15. Given the uncertainty surrounding this issue, Pinnacle asked the IGC for a clarification concerning the status of the Options. On January 21, 2005, the executive director of

the IGC, Ernest Yelton, advised Pinnacle's counsel that, following a review of the IGC's files, the IGC concluded that Mr. Hubbard had voluntarily relinquished his Options as part of the settlement proceedings with the IGC, and that the IGC had not approved an extension of the Options. Further, Mr. Yelton indicated that the IGC staff believed that Mr. Hubbard's attempt to exercise these Options constituted a breach of his settlement agreement with the IGC, which could subject him to disciplinary proceedings.

16. On January 24, 2005, Pinnacle's counsel relayed this information to Mr. Hubbard's counsel, pursuant to the IGC's authorization. Mr. Hubbard's counsel insisted that the IGC had approved the extension, that Pinnacle was aware of such extension, and that Mr. Hubbard was entitled to exercise his Options, notwithstanding the position stated by the IGC. Mr. Hubbard's counsel stated that Pinnacle would be liable to Mr. Hubbard for damages related to the Options.

**FIRST CLAIM FOR RELIEF**
**Declaratory Judgment Under 28 U.S.C. § 2201**
**(As Among Pinnacle, R.D. Hubbard, and the IGC)**

17. The allegations in paragraphs 1 through 16 are restated and incorporated herein as though fully set forth herein.

18. An actual controversy exists among Pinnacle, Mr. Hubbard, and the IGC with respect to the rights and legal relations of Pinnacle and Mr. Hubbard in connection with the stock Mr. Hubbard has sought to purchase by his attempt to exercise certain of the Options. Pinnacle therefore seeks a judgment declaring the parties' rights to avoid the accrual of potential liability to Mr. Hubbard, and to avoid a potential inquiry or disciplinary action by the IGC.

## PRAYER

WHEREFORE, Plaintiff Pinnacle Entertainment, Inc. prays for the following relief with respect to the controversy among Pinnacle, Defendant R.D. Hubbard, and Defendant Indiana Gaming Commission:

1. a judgment declaring *either* (a) that Pinnacle is obligated to sell to Mr. Hubbard the common stock he sought to purchase by the attempted exercise of certain of the Options as well as any of the other options that he may choose to exercise based on their extended terms, *or* (b) that Pinnacle is not obligated to sell any such stock to Mr. Hubbard, and that Pinnacle was not and is not obligated to give written notice of the extension of the Options to the IGC; and

2. such other and further relief as the Court shall deem just and equitable.

Dated: January 25, 2005.

BAKER & DANIELS

By: _____

Ronald D. Gifford
300 N. Meridian Street, Suite 2700
Indianapolis, IN 46204
Tel.: (317) 237-1409
Fax: (317) 237-1000

ATTORNEYS FOR PLAINTIFF
PINNACLE ENTERTAINMENT, INC.

Of counsel:

BRIOL & ASSOCIATES, PLLC
Mark J. Briol
William G. Carpenter
3700 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Tel.: (612) 337-8410
Fax: (612) 337-5151

INIMAN2 920082v1